# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 20-5759

GILBERT R. DURAN, APPELLANT,

V.

DENIS MCDONOUGH,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued November 15, 2022                    Decided July 20, 2023)

*Stephani M. Bennett*, with whom *John S. Berry* and *Emily A. Weiss* were on the brief, all of Lincoln, Nebraska, for the appellant.

*Nathan Bader*, with whom *Richard A. Sauber*, General Counsel; *Mary Ann Flynn*, Chief Counsel; *Joan E. Moriarty*, Deputy Chief Counsel; and *Crystal Liu* were on the brief, all of Washington, D.C., for the appellee.

Before ALLEN, TOTH, and JAQUITH, *Judges*.

TOTH, *Judge*, filed the opinion of the Court. JAQUITH, *Judge*, filed a concurring opinion. ALLEN, *Judge*, filed an opinion concurring in part and concurring in the judgment.

TOTH, *Judge*: Army veteran Gilbert R. Duran is entitled to VA disability compensation for Parkinson's disease. The compensation rating for this condition is governed primarily by diagnostic code (DC) 8004. *See* 38 C.F.R. § 4.124a (2023).[1] In the decision under review, the Board replaced the minimum 30% rating Mr. Duran had been receiving under DC 8004 with a combined 50% rating for three distinct Parkinson's manifestations evaluated under different DCs. These three ratings accounted for only some of his confirmed Parkinson's manifestations. This appeal raises a narrow question about the proper reading of DC 8004: When some manifestations of Parkinson's disease are rated as compensable and total more than 30% under DCs other than

---

[1] The Board also denied a rating greater than 30% for residuals to the nerves in his hand of a gunshot wound in the right arm, a rating greater than 30% for residuals of a gunshot wound to the right chest (muscle group VI), and a rating greater than 30% for residuals of a gunshot wound to the right triceps (muscle group VI). Because Mr. Duran does not challenge those matters on appeal, the Court dismisses them. *See Pederson v. McDonald*, 27 Vet.App. 276, 283 (2015) (en banc).

DC 8004, but some manifestations remain that are not rated as compensable, do the ratings under the other DCs replace or combine with DC 8004's minimum 30% rating?

Both parties offer a plain reading of the regulation to support their view. The Secretary agrees with the Board that DC 8004's minimum 30% rating should be replaced when ratings available under other DCs exceed it. Mr. Duran argues that compensable ratings under other DCs should be added to DC 8004's minimum 30% rating so long as additional ascertainable Parkinson's manifestations exist that are not otherwise compensable under the rating schedule. Based on the relevant text and regulatory context and the broader policies governing VA's rating scheme, we agree with Mr. Duran on the regulation's plain meaning. We therefore reverse the Board's discontinuance of the minimum 30% rating under DC 8004 and remand the matter—along with a PTSD rating claim that we briefly address at the end of our opinion—for further proceedings.

## I. BACKGROUND

### A. *Regulatory Framework*

DC 8004 and its accompanying guidance fall under the rating schedule for neurological conditions and convulsive disorders and have existed in their current form since just after World War II. *See* 29 Fed. Reg. 6718, 6750 (May 22, 1964) (codifying "the 1945 rating schedule"). In fact, DC 8004 still refers to Parkinson's as paralysis agitans. Parkinson's disease "is a chronic, slowly progressive central nervous system disorder characterized by muscular rigidity, a tremor of resting muscles, slow and decreased voluntary movements and positional instability." VA ADJUDICATION PROCEDURES MANUAL (M21-1), Pt. V, sbpt. iii, ch. 12, sec. C.3.a. It has so far proven incurable.[2] DC 8004 provides a single "[m]inimum rating" of 30%. 38 C.F.R. § 4.124a. The preamble to the rating schedule instructs:

> With the exceptions noted, disability from the following diseases and their residuals may be rated from 10 percent to 100 percent in proportion to the impairment of motor, sensory, or mental function. Consider especially psychotic manifestations,

---

[2] *See Parkinson's disease*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/parkinsons-disease/symptoms-causes/syc-20376055; *Parkinson's Disease: Causes, Symptoms, and Treatments*, NAT'L INST. ON AGING, https://www.nia.nih.gov/health/parkinsons-disease.

"Paralysis agitans" is a term for "shaking palsy" used by Dr. James Parkinson in his groundbreaking 1817 essay on the disease that would be given his name. James Parkinson, *An Essay on the Shaking Palsy* (1817), reprinted in 14 J. NEUROPSYCHIATRY & CLINICAL NEUROSCIENCES 223 (May 2002), https://doi.org/10.1176/jnp.14.2.223. "Paralysis agitans" remains synonymous with Parkinson's disease. *See Paralysis agitans*, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1356 (33d ed. 2019).

complete or partial loss of use of one or more extremities, speech disturbances, impairment of vision, disturbances of gait, tremors, visceral manifestations, etc., referring to the appropriate bodily system of the schedule. With partial loss of use of one or more extremities from neurological lesions, rate by comparison with the mild, moderate, severe, or complete paralysis of peripheral nerves.

*Id.* The note following DC 8025 further instructs:

It is required for the minimum ratings for residuals under [DCs] 8000-8025, that there be ascertainable residuals. Determinations as to the presence of residuals not capable of objective verification, i.e., headaches, dizziness, fatigability, must be approached on the basis of the diagnosis recorded; subjective residuals will be accepted when consistent with the disease and not more likely attributable to other diseases or no disease. It is of exceptional importance that when ratings in excess of the prescribed minimum ratings are assigned, the [DCs] utilized as bases of evaluation be cited, in addition to the codes identifying the diagnoses.

*Id.*

## B. *Case History*

Army veteran Gilbert Duran served from 1969 to 1971, including a year-long deployment to Vietnam, where he was wounded. In January 2017, he sought service connection for Parkinson's disease as related to presumptive herbicide exposure. That spring, a VA examiner confirmed a diagnosis of Parkinson's disease and found that Mr. Duran had "motor manifestations" of the condition, including stooped posture, balance impairment, slowed motion, speech changes, and tremors in his upper and lower extremities on the right side. R. at 896. The examiner also found that Mr. Duran had mild depression, partial loss of smell, moderate sleep disturbances, mild difficulty chewing and swallowing, moderate constipation, moderate sexual dysfunction, mild stumbling issues, and moderate jaw tremors.

VA granted service connection for Parkinson's disease, assigning a 30% rating under DC 8004 for "ascertainable residuals."[3] R. at 858. The rating decision stated that "[h]igher evaluations are based on more severe residuals" but said no more than that. *Id.* Mr. Duran appealed to the Board, seeking a higher Parkinson's rating. The case followed the usual administrative appeals process.

In an April 2020 decision, the Board increased Mr. Duran's rating because his single 30% rating under DC 8004 didn't fully capture the severity of his Parkinson's disease. The method by

---

[3] VA adjudicators routinely referred to manifestations of Mr. Duran's Parkinson's disease as "residuals." As we note below, it does not appear strictly accurate to speak of Parkinson's "residuals," but VA's distinctive use of the term is immaterial to the issue on appeal.

which the Board increased Mr. Duran's rating is the crux of the dispute here. Referring to the preamble of § 4.124a, the Board found that, if "there are ascertainable residuals that can be rated under a separate [DC], and the combined disability rating resulting from these residuals exceeds 30 percent, then these separate ratings will be assigned *in place of the minimum rating* assigned under [DC] 8004." R. at 16–17 (emphasis added). The Board also referred to § 4.120 ("Evaluations by comparison") to explain that neurological and convulsive disorders are rated in proportion to the impairment of motor, sensory, or mental function, meaning that evaluations are made by comparison to the appropriate rating criteria.

On this reasoning, the Board replaced Mr. Duran's single 30% rating with separate ratings for three manifestations—a 40% rating for a right upper extremity condition under DC 8513 (paralysis of a major extremity), a 10% rating for a right lower extremity condition under DC 8520 (paralysis of the sciatic nerve), and a 10% rating for moderate jaw tremors under DC 8205 (paralysis of the fifth trigeminal cranial nerve). *See* R. at 6 (noting that the veteran's symptoms "are most appropriately rated under separate rating criteria as opposed to rated collectively under [DC] 8004"). The DCs for these manifestations all fall under the rating schedule for neurological diseases and convulsive disorders and combine to a rating of 50%. *See* 38 C.F.R. § 4.124a.

The Board also found that the veteran had five other manifestations of Parkinson's disease, including constipation, depression, sexual dysfunction, a chewing and swallowing condition, and a speech condition. It determined that a separate rating wasn't permitted for depression because that "would violate the prohibition on pyramiding as the Veteran's symptoms are already contemplated in the 30% rating assigned for [his] service-connected PTSD." R. at 18. The Board similarly found that a separate rating for sexual dysfunction was unwarranted because special monthly compensation for loss of use of a creative organ had already been granted. Finally, the Board denied separate compensable ratings for the veteran's remaining manifestations— constipation under DC 7319 (irritable colon syndrome), his chewing and swallowing condition under DC 8209 (paralysis of the ninth (glossopharyngeal) cranial nerve), and his speech condition under DC 8210 (paralysis of the tenth (pneumogastric) cranial nerve)—because none of those conditions met the requirements for minimum compensable ratings under their relevant DCs. This appeal followed.

4

## II. ANALYSIS

The dispute here requires us to interpret 38 C.F.R. § 4.124a as it relates to Mr. Duran's claim for an increased Parkinson's rating. Specifically, whether that provision requires VA to replace or add to the minimum 30% rating under DC 8004 when a veteran has some Parkinson's manifestations that are separately rated under other DCs and total more than 30%, *and* some Parkinson's manifestations that are not separately rated under other DCs as compensable.

Such interpretation is a task we undertake de novo. *Tropf v. Nicholson*, 20 Vet.App. 317, 320 (2006). If the regulation's meaning is clear from its language, that is "the end of the matter." *Brown v. Gardner*, 513 U.S. 115, 120 (1994). The plain meaning of the text at issue is informed by the regulatory scheme and context of the provision. *BO v. Wilkie*, 31 Vet.App. 321, 328 (2019). And a regulation's text, structure, history, and purpose should be carefully considered before the Court concludes that a regulation is ambiguous and considers whether deference is warranted. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). Only if the regulation's text is genuinely ambiguous "after a court has resorted to all the standard tools of interpretation" does "the possibility of deference . . . arise." *Id.* at 2414.

Mr. Duran contends that, under a plain reading of the relevant regulatory provisions, the minimum rating should remain intact so long as there are ascertainable Parkinson's manifestations that cannot be rated compensable under other DCs. For his part, the Secretary believes that a plain reading requires the replacement of DC 8004's minimum rating once any Parkinson's manifestations can be assigned ratings totaling more than 30% under other DCs.

There are three components to § 4.124a at issue here: the preamble to the rating schedule for neurological conditions and convulsive disorders, DC 8004 itself, and the note applicable to DCs 8000 through 8025. We first consider the text of these provisions and begin with a brief comment on the word "residuals."

Throughout the pendency of the claim, VA adjudicators referred to the "residuals" of Mr. Duran's Parkinson's disease. In the medical context, a residual is disability that remains following an injury, operation, or disease.[4] For example, VA compensation claims may involve gunshot wound residuals or post-knee replacement residuals. When it comes to diseases, the rating schedule often prescribes different ratings for the active disease process and for residuals when the disease

---

[4] *See Residual*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/residual; *Residual*, DICTIONARY.COM, https://www.dictionary.com/browse/residual.

process is in remission or inactive. *See, e.g.*, 38 C.F.R. §§ 4.88b (2023) and 4.117, DC 7703, Note (1) (2023). Section 4.124a follows this practice with respect to encephalitis, poliomyelitis, and meningitis, assigning 100% ratings for the "active" diseases and minimum 10% ratings for "residuals." 38 C.F.R. § 4.124a, DCs 8000, 8011, 8019. But as a chronic, progressive disease, Parkinson's cannot be cured and does not have inactive periods. So, although Parkinson's disease manifests itself in various ways, it does not appear strictly accurate to call these manifestations "residuals," as that word is normally used. Indeed, unlike the DCs for the diseases just mentioned, the DC for Parkinson's doesn't mention residuals or provide a 100% rating for the "active" phase of the disease. We note this because we think it important to use proper parlance when discussing the veteran's condition. That said, the Court's analysis is practically unaffected by whether Mr. Duran's problems related to his Parkinson's are referred to as residuals or manifestations.

This is clear from the preamble to § 4.124a, which doesn't distinguish between the two for compensation purposes. It states that "disability from the following diseases and their residuals may be rated from 10 to 100 percent *in proportion to* the impairment of motor, sensory, or mental function," with special consideration to be paid to certain "manifestations." 38 C.F.R. § 4.124a (emphasis added). ("Proportion" means "the relation of one part to another or to the whole with respect to magnitude, quantity, or degree."[5]) So, the preamble makes clear that neurological conditions like Parkinson's disease are to be rated proportionally to the degree of impairment caused by either the active manifestations of a disease or by a disease's residuals.

The remainder of § 4.124a's preamble indicates the method by which the criteria will be chosen to rate a disease's manifestations or residuals: by "referring to the appropriate bodily system of the schedule." *Id.* Put simply, VA should rate a residual under the rating schedule of the bodily system relevant to that residual. For example, the preamble directs that partial loss of use of one or more extremities from neurological lesions should be rated "by comparison with the mild, moderate, severe, or complete paralysis of peripheral nerves." *Id.; see* 38 C.F.R. § 4.124a, DCs 8510 to 8540 ("Diseases of the Peripheral Nerves").

The preamble's instructions accord with VA's broader policy when rating neurological conditions by comparison. That policy is to ensure that a disability in this area is "rated in

---

[5] *Proportion*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/proportion.

proportion to the impairment of motor, sensory or mental function," and with reference "to the appropriate schedule" for each disabling manifestation. 38 C.F.R. § 4.120 (2023).

DC 8004 itself is laconic but informative. It has one available rating, a "[m]inimum rating" of 30%. This means that every veteran with service-connected Parkinson's disease is entitled to at least a 30% rating regardless of the veteran's particular disease manifestations. Put differently, a Parkinson's diagnosis justifies a minimum rating of 30% where its manifestations, either singly or together, do not warrant a rating higher than 30%. And that is so whether a particular veteran's manifestation ratings under pertinent bodily systems total 0% or 30%.

Finally, we turn to the note following DC 8025. It specifies that a minimum rating available under a particular DC requires that "residuals"—and we presume "residuals" here is meant to include "manifestations"—"be ascertainable" to VA adjudicators, either through "objective verification" or acceptance on the grounds of consistency with the disease in question. 38 C.F.R. § 4.124a. The last line of the note reads: "It is of exceptional importance that when ratings in excess of the prescribed minimum ratings are assigned, the diagnostic codes utilized as bases of evaluation be cited, in addition to the codes identifying the diagnoses." This text both acknowledges that ratings in excess of the prescribed minimums may be warranted and emphasizes that the DCs under which such ratings are assigned should be clearly identified.

Taken together, these three regulatory provisions offer a clear answer to the question presented by this appeal. By virtue of having a diagnosis of Parkinson's disease with at least one ascertainable manifestation, Mr. Duran is entitled to a minimum 30% under DC 8004. Even when ascertainable manifestation ratings under other DCs combine for a total rating in excess of 30%, the basis for the minimum rating under DC 8004 remains as long as there is at least one ascertainable manifestation of Parkinson's disease that is not compensable under any other DC. Thus, when VA assigns compensable ratings for Parkinson's manifestations that total more than 30% under DCs other than DC 8004, those other ratings do not replace the minimum 30% rating under DC 8004 *provided that* some manifestations remain that are not rated as compensable.

This textual reading harmonizes with the key policies of VA's overall rating scheme, namely, that veterans should not be undercompensated or overcompensated for a particular condition. *See Burkhart v. Wilkie*, 971 F.3d 1363, 1369–70 (Fed. Cir. 2020) (explaining that a regulatory scheme should be read "as 'an harmonious whole'" (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000))).

7

As a rule, "disabilities arising from a single disease entity . . . are to be rated separately." 38 C.F.R. § 4.25(b) (2023). And consistent with that rule, VA undertakes to "grant[ ] every benefit that can be supported in law." 38 C.F.R. § 3.103(a) (2023). Section 3.103(a)'s general statement of policy is given content by the specific substantive provisions in a particular case. *Cf. Hanser v. McDonough*, 56 F.4th 967, 975 (Fed. Cir. 2022) ("This statement of policy cannot contradict the plain meaning of a regulation."). Here, that content is provided by DC 8004 and its accompanying provisions, which make clear VA's judgment that a diagnosis of Parkinson's disease with at least one ascertainable manifestation entitles a veteran to a minimum 30% rating. That judgment being plain, it is equally obvious that replacing DC 8004's minimum rating despite the presence of ascertainable Parkinson's manifestations that are not being compensated under other DCs would amount to a discontinuance of the compensation provided by the minimum rating for those (otherwise uncompensated) manifestations. Replacing DC 8004's minimum rating in Mr. Duran's circumstances would, in other words, undercompensate him.

Conversely, our understanding that replacement of DC 8004's minimum 30% rating is prohibited only when uncompensated Parkinson's manifestations remain jibes with the rule against pyramiding, which bars "evaluation of the same disability under various diagnoses." 38 C.F.R. § 4.14 (2023). The gravamen of this rule is that a certain manifestation of a disability compensated under a particular DC cannot also be compensated under another DC. *See Lyles v. Shulkin*, 29 Vet.App. 107, 118 (2017); *see also Amberman v. Shinseki*, 570 F.3d 1377, 1381 (Fed. Cir. 2009) (agreeing that § 4.14 prohibits the "duplicative" compensation of "overlapping" symptomatology (emphasis omitted)). Maintaining a minimum 30% rating under DC 8004 where all of a veteran's Parkinson's manifestations are rated as compensable under other DCs would overcompensate a veteran.

Here, the Board found that Mr. Duran's Parkinson's disease manifested itself in at least eight ways. It concluded that three of those manifestations were entitled to separate compensable ratings that totaled 50% and that two were already compensated as parts of other conditions. That left three remaining manifestations that were not compensable under other DCs pertaining to the bodily systems involved: constipation, a chewing and swallowing condition, and a speech condition. Even in isolation, any of these three ascertainable manifestations warranted the minimum 30% rating under DC 8004. That means the Board should not have replaced the 30% rating under DC 8004 in this case. We therefore reverse the Board's discontinuance of that rating.

Because we are able to discern the plain meaning of the relevant regulatory text using standard interpretive tools, we need not reach the Secretary's argument that—in the case of ambiguity—his interpretation is entitled to deference under *Auer v. Robbins*, 519 U.S. 452 (1997). *See Kisor*, 139 S. Ct. at 2414.

### III. PTSD REMAND

Mr. Duran also appealed the Board's denial of a rating greater than 30% for service-connected PTSD under the General Rating Formula for Mental Disorders. *See* 38 C.F.R. § 4.130 (2023). He argues that the Board erred in not addressing certain symptoms that were documented in lay statements and medical reports from 2017. The Secretary concedes that the Board erred in this respect. Secretary's Br. at 14. The Court accepts the Secretary's concession of Board error. Thus, remand is required for the Board to consider and cure the defect in its decision identified by the parties' briefs.

### IV. CONCLUSION

Accordingly, the Court VACATES that part of the Board's April 23, 2020, decision that denied a rating in excess of 30% for PTSD and REVERSES that part that discontinued the 30% rating under DC 8004 for Parkinson's disease. Those matters are REMANDED for further proceedings consistent with this opinion. The balance of the appeal is DISMISSED.

JAQUITH, *Judge*, concurring: I concur with all of the Court's opinion but write separately because I believe the pro-veteran canon informs the plain meaning analysis and because I also agree with the portion of Judge Allen's partial concurrence regarding deference to VA's construction of 38 C.F.R. § 4.124a, DC 8004.

As the majority opinion describes, the rating scheme for Parkinson's disease has three components. First is a preamble that applies to "neurological conditions and convulsive disorders" and begins: "With the exceptions noted, disability from the following diseases and their residuals may be rated from 10 percent to 100 percent in proportion to the impairment of motor, sensory, or mental function." 38 C.F.R. § 4.124a. Next is DC 8004, "[p]aralysis agitans," with a minimum rating of 30%. Last is a note that begins, "It is required for the minimum ratings for residuals under diagnostic codes 8000–8025, that there be ascertainable residuals." The note ends, "It is of

9

exceptional importance that when ratings in excess of the prescribed minimum ratings are assigned, the diagnostic codes utilized as bases of evaluation be cited, in addition to the codes identifying the diagnoses." In this case, the Board determined that this rating scheme means that "[i]f there are ascertainable residuals that can be rated under a separate Diagnostic Code, and the combined disability rating resulting from these residuals exceeds 30 percent, then these separate ratings will be assigned in place of the minimum rating assigned under [DC] 8004." Record (R.) at 17. I agree completely with the majority opinion's conclusion that the Board was wrong, and "compensable ratings under other DCs should be added to DC 8004's minimum 30% rating so long as additional ascertainable Parkinson's manifestations exist that are not otherwise compensable under the rating schedule." *Ante* at 2. I also agree with the partial concurrence that the words of the preamble, DC 8004, and the note do not, by themselves, conclusively answer the question of what happens to the minimum rating when the separate ratings exceed 30%. *See post* at 20. In my view, the cranny between us is a consequence of our different perspectives on determining the law's plain meaning. I concur fully with the majority opinion because I believe discerning the plain meaning of the rating scheme for Parkinson's disease requires more than just reviewing the words of the preamble, DC 8004, and the note.

### 1. Plain Meaning

To start, the Court's obligation to "exercise independent review over the meaning of agency rules" requires us to "apply all traditional methods of interpretation" to this regulation and "enforce the plain meaning those methods uncover." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2419 (2019). That mission statement sounds straightforward, but a legal dictionary's definition of the "plain-meaning rule" portends complications. The dictionary defines the rule as "[t]he doctrine that if a legal text is unambiguous it should be applied by its terms without recourse to policy arguments, legislative history, or any other matter extraneous to the text unless doing so would lead to an absurdity." *Plain-meaning rule*, BLACK'S LAW DICTIONARY 1391 (11th ed. 2019). The definition continues with an admonition: "Though often applied, this rule is often condemned as simplistic because the meaning of words varies with the verbal context and the surrounding circumstances, not to mention the linguistic ability of the users and readers (including judges)." *Id.* And the dictionary adds another author's warning:

10

"On its positive side, the plain meaning rule states a tautology: Words should be read as saying what they say. The rule tells us to respect meaning but it does so without disclosing what the specific meaning is. At best, it reaffirms the preeminence of the statute over materials extrinsic to it. In its negative aspect, on the other hand, the rule has sometimes been used to read ineptly expressed language out of its proper context, in violation of established principles of meaning and communication. To this extent it is an impediment to interpretation."

*Id.* (quoting Reed Dickerson, THE INTERPRETATION AND APPLICATION OF STATUTES 229 (1975).

Our interpretive inquiry begins by focusing on the words, for "if the meaning of a regulation is clear from its language, that meaning controls and that is the end of the matter." *Petitti v. McDonald*, 27 Vet.App. 415, 422-23 (2015); *see also, e.g., Edwards v. McDonough*, 36 Vet.App. 56, 61 (2023). But the Court "cannot wave the ambiguity flag" without first exhausting our "legal toolkit" to determine whether there is a single right meaning. *Kisor*, 139 S. Ct. at 2415. We must focus on regulatory language with a wide lens because, "[w]hen assessing the meaning of a regulation, words should not be taken in isolation but rather read in the context of the regulatory structure and scheme." *Atencio v. O'Rourke*, 30 Vet.App. 74, 82 (2018). The Court "retain[s] a firm grip on the interpretive function," *Kisor*, 139 S. Ct. at 2421, by carefully considering "the text, structure, history, and purpose of a regulation" to penetrate seemingly "impenetrable" regulations, solve "hard interpretive conundrums," and determine whether "there is only one reasonable construction of a regulation," *id.* at 2415; *see Huerta v. McDonough*, 34 Vet.App. 76, 80 (2021). We peg the plain meaning of a particular provision by viewing it in the broader regulatory context. *See, e.g., Babcock v. Kijakazi*, 142 S. Ct. 641, 645 (2022) (applying that principle in ascertaining the plain meaning of a statute). "'In construing regulatory language, we must read the disputed language in the context of the entire regulation as well as other related regulatory sections in order to determine the language's plain meaning.'" *Martinez-Bodon v. McDonough*, 28 F.4th 1241, 1244 (Fed. Cir. 2022) (quoting *Vazquez-Claudio v. Shinseki*, 713 F.3d 112, 115 (Fed. Cir. 2013).

Though the regulation and diagnostic code at issue here date to the 1945 rating schedule,[6] the central question in this case has not previously been specifically answered. But the paradigm and principles that provide the majority opinion's answer are well established. "[I]f an injury or disease manifests with two different disabilities, then two separate ratings should be awarded."

---

[6] *Ante* at 2; 29 Fed. Reg. 6718, 6750 (May 22, 1964).

*Tropf v. Nicholson*, 20 Vet.App. 317, 321 (2006); *see* 38 C.F.R. § 4.25(b) (2023). And the number of separate ratings for different disabilities is not limited to two, or to any maximum number. Section 4.25(b) provides: "Except as otherwise provided in [the rating] schedule, the disabilities arising from a single disease entity . . . are to be rated separately as are all other disabling conditions, if any." Subsection (b) was added to § 4.25 in 1989, 54 Fed. Reg. 27,161, 27,162 (June 28, 1989), but § 4.25 has contemplated combining separate ratings for different disabling conditions since its inception (with 38 C.F.R. § 4.124a, DC 8400). 29 Fed. Reg. 6718, 6720-21, 6750 (May 22, 1964).

The prescription of "avoidance of pyramiding," 38 C.F.R. § 4.14, has the same origin story. 29 Fed. Reg. at 6719. Section 4.14 began, and still begins: "The evaluation of the same disability under various diagnoses is to be avoided," and ends: "[T]he evaluation of the same manifestation under different diagnoses [is] to be avoided." 38 C.F.R. § 4.14 (2023).[7] "Properly read, § 4.14 and § 4.25 are complementary provisions instructing VA to rate only distinct manifestations separately." *Perciavalle v. McDonough*, 35 Vet.App. 11, 27-28 (2021) (en banc). The anti-pyramiding rule means "that the rating schedule may not be employed as a vehicle for compensating a claimant twice (or more) for the same symptomatology[ because] such a result would overcompensate the claimant for the actual impairment of his [or her] earning capacity." *Brady v. Brown*, 4 Vet.App. 203, 206 (1993). However, "[o]f course, it is possible for a veteran to have separate and distinct manifestations attributable to two different disability ratings, and, in such a case, the veteran should be compensated under different diagnoses." *Fanning v. Brown*, 4 Vet.App. 225, 230 (1993).

The Board found that Mr. Duran has eight separate manifestations of Parkinson's disease: a right upper extremity condition rated 40% disabling under DC 8513; a right lower extremity condition rated 10% disabling under DC 8520; moderate jaw tremors rated 10% disabling under DC 8205; constipation (DC 7319), a chewing and swallowing condition (DC 8209), and a speech condition (DC 8210) that are not separately compensable; depression contemplated in the 30% rating for his PTSD; and sexual dysfunction covered by SMC for loss of use of a creative organ.[8]

---

[7] So it also was in the 1945 rating schedule codified in 1964. 38 C.F.R. § 4.14 (1964).

[8] At oral argument, the veteran's counsel asserted that "[a]t the time of service connection, Mr. Duran was suffering from four identifiable symptoms of Parkinson's. By the time he reached the Board five years later, he was suffering with more than thirteen." Oral Argument (OA) at 7:31-7:44, *Duran v. McDonough*, U.S. Vet.App. No. 20-5759 (oral argument held November 15, 2022), https://www.youtube.com/watch?v=H3Xng5euocg&t=3387s. VA acknowledges that Parkinson's is a progressive disease. *Id.* at 29:38-29:46. *See* VA ADJUDICATION PROCEDURES

R. at 18-21. The Board assigned the combined disability rating for the veteran's right extremity and jaw tremors in place of the Parkinson's rating under DC 8004, with no compensation for his constipation, chewing and swallowing, and speech conditions. R. at 17, 19-21. The Board's action cannot be squared with § 4.25(b).

"The rating schedule is replete with rules that prohibit separate evaluation of other disabilities," *Lyles v. Shulkin*, 29 Vet.App. 107, 114, 115 (2017) (applying this analysis to hold that "evaluation of a knee disability under DC 5257 or 5261 does not preclude . . . separate evaluation of a meniscal disability of the same knee under DC 5258 or 5259"), so it is telling that the rating scheme for Parkinson's does not expressly prohibit coupling separate ratings for manifestations of the disease under other diagnostic codes with "residuals" under DC 8004. Given VA's history of expressly forbidding separate ratings in other circumstances, the lack of an express bar to separate evaluations of specific manifestations of Parkinson's and the uncompensated residuals of the disease "must be read as a deliberate decision to permit separate evaluation." *Lyles*, 29 Vet.App. at 115. The rule that emerges is a straightforward one, and it governs here: "where a certain manifestation of a disability has not been compensated via an assigned evaluation under a particular DC, evaluation of that manifestation under another DC would not constitute pyramiding." *Id.* at 118. Therefore, in this case, as in *Lyles*, the Board's reading contravenes the plain meaning of the regulation. *Id.* at 115.

### 2. The Pro-Veteran Canon

The Board's determination also conflicts with the longstanding pro-veteran canon—"'that provisions for benefits to members of the Armed Services are to be construed in the beneficiaries' favor.'" *Henderson v. Shinseki*, 562 U.S. 428, 441 (2011) (quoting *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 n.9 (1991)). If reading the preamble, DC 8004, and the note with § 4.25(b) make clear that Mr. Duran deserves separate ratings, why should we consider the pro-veteran canon? First and foremost, because the canons of regulatory construction "require interpretation of words in their context with an eye to the law as a whole," *Ortiz-Valles v. McDonald*, 28 Vet.App. 65, 69 (2016), and the context of the law as a whole should include the pro-veteran canon.

---

MANUAL, M21-1, Part III, Subpart iv, 4.N.8.a (2020) ("Parkinson's disease is a chronic, slowly progressive central nervous system disorder.").

13

In *King*, the Supreme Court stated that it presumed that Congress understood the pro-veteran canon as a basic rule of statutory construction, and the Court applied that canon to read a provision in the veteran's favor, even if the language left its significance unsettled. 502 U.S. at 220 n.9. In *Henderson*, the Supreme Court read the statute at issue in light of the pro-veteran canon, declaring that "[w]hile the terms and placement of [the statute] provide some indication of Congress' intent, what is most telling here are the singular characteristics of the review scheme that Congress created for the adjudication of veterans' benefits claims." 562 U.S. at 440-42. And in *Fishgold v. Sullivan Drydock & Repair Corp.*, the Supreme Court declared that veteran laws are "to be liberally construed for the benefit of those who left private life to serve their country in its hour of great need," and the Court showed us how to do so—"construe the separate provisions of the [law] as parts of an organic whole and give each as liberal a construction for the benefit of the veteran as a harmonious interplay of the separate provisions permits." 328 U.S. 275, 285 (1946). "Simply put, the veteran's canon is a traditional tool of interpretation." Chadwick J. Harper, *Give Veterans the Benefit of the Doubt:* Chevron*,* Auer*, and the Veteran's Canon*, 42 HARV. J.L. & PUB. POL'Y 931, 949 (2019); *see Procopio v. Wilkie*, 913 F.3d 1371, 1383 (Fed. Cir. 2019) (O'Malley, J., concurring) ("There is also no doubt that the pro-veteran canon is one such traditional tool [of statutory construction]."). "[T]he veteran's canon has deep roots in our jurisprudence, reflects the unique relationship between the government and [veterans], and helps the government fulfill the obligations flowing from that relationship." Harper, 42 HARV. J.L. & PUB. POL'Y at 958.

The fourth case on the Mount Rushmore of the pro-veteran canon, *Brown v. Gardner*, 513 U.S. 115 (1994), brings the scope of plain meaning analysis back to the forefront. In *Gardner*, the Board denied the veteran's claim for benefits under 38 U.S.C. § 1151 based on disabilities resulting from surgery in a VA facility. *Id*. at 116-17. The Board's denial rested on 38 C.F.R. § 3.358(c)(3) (1993), which interpreted the statute as only covering an injury that proximately resulted from fault by VA or from an accident during treatment or rehabilitation. *Id.* Though the statute afforded compensation for injuries resulting from surgery and said nothing about fault by VA, the Secretary argued that a fault requirement inhered in the statutory requirement of a compensable injury. *Id.* at 117. In rejecting that argument based on the law's "text and reasonable inferences from it," the Supreme Court looked first to the pro-veteran canon, which it summarized as "the rule that interpretive doubt is to be resolved in the veteran's favor." *Id.* at 120, 117-18. Notwithstanding *Henderson*, *King*, and *Fishgold*, that 13-word phrase in *Gardner* has been unlucky for veterans.

In *Kisor*, the Supreme Court did not address whether the pro-veteran canon is a traditional tool of construction that must be considered before concluding that a rule is genuinely ambiguous. 139 S. Ct. at 2415. On remand, the Federal Circuit filled the breach, declaring that: "Under [*Gardner*], . . . the canon does not apply unless 'interpretive doubt' is present," a precondition that "is not satisfied where a sole reasonable meaning is identified through the use of ordinary textual analysis tools, before consideration of the pro-veteran canon." *Kisor v. McDonough*, 995 F.3d 1316, 1325–26 (Fed. Cir. 2021) (known as *Kisor IV*) (quoting *Gardner,* 513 U.S. at 117-18), *cert. denied*, 142 S. Ct. 756 (2022). On that basis, the Federal Circuit determined that the canon did not apply because the regulatory text at issue had only one reasonable meaning. *Id*. at 1326. The conclusion in *Kisor IV* that the disputed term was not ambiguous, *id.* at 1319, was the opposite of its prior holding—which did not cite *Gardner* or mention the pro-veteran canon. *Kisor v. Shulkin*, 869 F.3d 1360 (Fed. Cir. 2017) (*Kisor I*), *vacated and remanded sub nom. Kisor v. Wilkie*, 139 S. Ct. 2400 (2019).

The dissent in *Kisor IV* disagreed that interpretive doubt "must be established before the pro-veteran canon can be applied." *Kisor IV*, 995 F.3d at 1327 (Reyna, J., dissenting). Judge Reyna declared:

> Fundamentally, when a veterans' benefit provision is ambiguous on its face, the pro-veteran canon must be weighed alongside the other traditional tools in resolving interpretive doubt, including whether interpretative doubt exists. Neither the Supreme Court's decision in this case, nor this court's precedent, supports the majority's assumption that interpretive doubt is to be determined before resort to the pro-veteran canon may be had. To the contrary, the pro-veteran canon is a traditional tool of construction. It requires that we discern the purpose of a veterans' benefit provision in the context of the veterans' benefit scheme as a whole and ensure that the construction effectuates, rather than frustrates, that remedial purpose: that benefits that by law belong to the veteran go to the veteran.

*Id.*

The debate continued when the Federal Circuit denied the veteran's petition for en banc review. *Kisor v. McDonough*, 995 F.3d 1347 (Fed. Cir. 2021) (per curiam order) (*Kisor V*). A concurrence concluded that *Gardner* made interpretive doubt "a precondition for applying the canon" and "the hierarchy of interpretive tools" means courts "should consider the pro-veteran canon only if, after exhausting all applicable descriptive tools in search of the provision's best meaning, a range of plausible interpretations remains, none of them fairly described as the best." *Id.* at 1354, 1358, 1359 (Prost, C.J., concurring). A dissenter's response included, in pertinent part:

The pro-veteran canon of construction is not meant to be an afterthought. It is a tool in the interpretive toolkit that aids in gleaning congressional intent where the plain text of the statute or regulation does not clearly answer the question at hand. . . .

. . . .

The majority . . . cites only *Brown v. Gardner* for its decision to remove the pro-veteran canon—and apparently numerous other canons—from the interpretive toolkit it employs. But [*Gardner*] does not hold that the pro-veteran canon is only an after the fact inquiry. . . [a]nd, it does not say that the pro-veteran canon is anything other than an interpretive canon. . . .

. . . .

The panel majority's latest approach is inconsistent with multiple Supreme Court cases which discuss the pro-veteran canon and treat it as one of the many canons of construction to be *collectively* employed when interpreting veterans benefit provisions. . . .

. . . .

[W]hen reviewing an agency's interpretation of a statute or regulation (as is the case here), the Supreme Court has made clear that we are to apply all tools of statutory construction to glean congressional intent. Where differing plausible, reasonable interpretations of the terms of a regulation are possible, Congress has spoken: it wants veterans' benefits to be administered in a "pro-claimant" manner.

*Id.* at 1366-72 (O'Malley, J., dissenting). And Judge Reyna added: "[*Kisor IV*] means that the pro-veteran canon comes into play at the bottom of the ninth inning, after three outs have been made, and as the players head to their respective dugouts. But by then, it's game over." *Id.* at 1376. After *Kisor V*, one panel of the Federal Circuit concluded that "[t]his court has not definitively resolved at what stage the pro-veteran canon applies." *Roby v. McDonough*, ___ F. 4th ___, No. 2020-1088, 2021 WL 3378834, at *8 (Fed. Cir. Aug. 4, 2021).

In my view, reading *Henderson*, *Gardner*, *King*, and *Fishgold* together makes clear that the dissenters in *Kisor IV* and *Kisor V* got it right and the pro-veteran canon is part of the context within which we ascertain plain meaning. *Gardner* certainly does not say otherwise. In *Gardner*, the Supreme Court did not find ambiguity or express interpretive doubt; the Court merely said that the most VA could claim was ambiguity to be resolved in its favor, noted that any interpretive doubt would be resolved in the veteran's favor, and held that VA's interpretation of the law was not even plausible. 513 U.S. at 117-18. Second, *Gardner* expressly relied on *King*, which applied the pro-veteran canon as a basic principle for reading provisions for veterans' benefits. *See Gardner*, 513 U.S. at 118 (citing *King*, 502 U.S. at 220 n.9). And third, *Henderson*, which came after *Gardner*, did not even mention it, instead relying on *King*, *Fishgold*, and the solicitude for veterans that imbues the scheme for adjudicating veterans' benefits claims, "'plac[ing] a thumb on

16

the scale in the veteran's favor.'" *Henderson*, 562 U.S. at 440 (quoting *Shinseki v. Sanders*, 556 U.S. 396, 412 (2009) (Souter, J., dissenting)).

Most importantly, *Gardner* itself makes clear that there is no binary choice between textual clarity and ambiguity, because "[a]mbiguity is a creature not of definitional possibilities but of . . . context." *Gardner*, 513 U.S. at 118. So we need not decide whether the Federal Circuit's interpretations of *Gardner* in *Kisor IV* and *Kisor V* nullify *Henderson*, *King*, and *Fishgold* and render the pro-veteran canon an empty platitude, because the central premise of *Gardner* resolves this case: the meaning of the language at issue, whether "'plain or not, depends on context.'" *Id*. at 118 (quoting *King*, 502 U.S. at 221). The Court cannot "'wave the ambiguity flag'" because the plain language of the preamble, DC, and note "does not conclusively resolve the issue." *Barry v. McDonough*, 35 Vet.App. 111, 122 (2022)[9] (quoting *Kisor*, 139 S. Ct. at 2415). With or without the pro-veteran canon, the context here—including § 4.25(b)—makes plain that separate manifestations of Parkinson's can be evaluated under other DCs while otherwise uncompensated ascertainable residuals support a 30% rating under DC 8004. That is the only meaning of the preamble, DC 8004, and note that is compatible with the law as a whole. *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988); *Thompson v. McDonald*, 815 F.3d 781, 785 (Fed. Cir. 2016) ("We read the words of a regulation in their context and with a view to their place in the overall regulatory scheme.").

### 3. The Board Decision Is Not Due Deference

Though the pro-veteran canon may not be needed to propel the proper rating for Mr. Duran, the canon would stay in play if the rules for evaluating Parkinson's were truly ambiguous in the context of the rating scheme. I agree with Judge Allen that the Board decision is not due any deference because it is clear that it is not VA's authoritative policy on rating disabilities arising from Parkinson's disease. *See Kisor*, 139 S. Ct. at 2416 (noting that deference is not due to an agency's ad hoc statements); R. at 22 ("The Board's decision in this case is binding only with respect to the instant matter decided. This decision is not precedential and does not establish VA policies or interpretations of general applicability.") I'd add that *Kisor* indicates that it would make

---

[9] *Barry* also holds that "a regulation is not ambiguous simply because both parties insist that the plain meaning supports his or her position and neither party's interpretation is unreasonable to the Court." 35 Vet.App. at 120 (citing *Kisor*, 139 S. Ct. at 2423); *compare post* at 20 & n.21.

no sense to defer to an official position by VA that conflicts with the pro-veteran canon. *See* 139 S. Ct. at 2416.

*Kisor* explains that "we give *Auer* deference[10] because we presume, for a set of reasons relating to the comparative attributes of courts and agencies, that Congress would have wanted us to." *Id.* But that presumption must give way to the special treatment Congress reserved for veterans—a veterans benefits scheme "'imbued with special beneficence from a grateful sovereign'"—in recognition that veterans such as Mr. Duran "risked both life and liberty in their military service to this country."[11] *Sneed v. Shinseki*, 737 F.3d 719, 728 (Fed. Cir. 2013) (quoting *Bailey v. West*, 160 F.3d 1360, 1370 (Fed. Cir. 1998) (Michel, J., concurring)); *see Henderson*, 562 U.S. at 440 (highlighting the longstanding solicitude of Congress for veterans and the resulting "review scheme that Congress created for the adjudication of veterans' benefits claims" in invoking the pro-veteran canon); Harper, 42 HARV. J.L. & PUB. POL'Y at 958-59 ("The language and logic of [*Gardner*] suggest that courts should apply the veteran's canon before turning to deference doctrines."). Congress could not have wanted courts to defer to agency interpretations that conflict with the characteristics of Congress's creation. When "the Secretary's interpretation [of the law] is unfavorable to veterans, such that it conflicts with the beneficence underpinning VA's veterans benefits scheme, and a more liberal construction is available that affords a harmonious interplay between provisions," the more liberal construction prevails. *Trafter v. Shinseki*, 26 Vet.App. 267, 272 (2013); *see Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 48 F.4th 1307, 1317 (Fed. Cir. 2022) (reaffirming that "'[e]ven if the government's asserted interpretation of [a regulation] is plausible, it would be appropriate under [the pro-veteran canon] only if the [regulatory] language unambiguously supported the government's interpretation.'" (*quoting Hudgens v. McDonald*, 823 F.3d 630, 639 (Fed. Cir. 2016)(alterations in original))).[12]

---

[10] *See Auer v. Robbins*, 519 U.S. 452, 461 (1997).

[11] Mr. Duran was awarded a Purple Heart for gunshot wounds to his chest and arm during his participation in the Vietnam War. R. at 176, 3273. And he is service connected for Parkinson's disease associated with herbicide exposure in Vietnam. R. at 883.

[12] *Hudgens* noted that "[i]n many cases, the tension between *Auer* and *Gardner* is difficult to resolve, since both seemingly direct courts to resolve ambiguities in a VA regulation but would, in many cases, counsel contrary outcomes." 823 F.3d at 639. *See Roby*, 2021 WL 3378834, at *8 ("This court has not definitively resolved at what stage the pro-veteran canon applies and whether it precedes any claims of deference to an agency interpretation.").

## 4. Conclusion

For the foregoing reasons: (1) I agree with the partial concurrence that the Board decision is not due any deference; (2) I believe the pro-veteran canon on which the system for adjudicating veterans' benefits is grounded is part of the context to consider in ascertaining the plain meaning of regulatory provisions; and (3) I concur fully with the majority opinion that the plain meaning of the preamble, DC, and note to 38 C.F.R. § 4.124a, DC 8004 , in the context of the rating scheme, provides that Mr. Duran's ratings under other DCs for separate manifestations of Parkinson's disease should be added to DC 8004's minimum 30% rating for additional ascertainable Parkinson's manifestations that are not otherwise compensable under the rating schedule.

ALLEN, *Judge*, concurring-in-part and concurring in the judgment:[13]

I concur in the Court's judgment reversing the Board's decision discontinuing appellant's 30% disability rating under diagnostic code (DC) 8004 for Parkinson's disease and remanding the matter for further proceedings. I write separately, however, because my path to reversal and remand diverges from the Majority's rationale. The Majority concludes that under 38 C.F.R. § 4.124a, DC 8004, when VA assigns separate compensable ratings for Parkinson's manifestations that total more than 30% under DCs other than DC 8004, those separate ratings do not replace the minimum 30% rating under DC 8004 provided that some manifestations remain that are not separately rated as compensable.[14] So far, so good, because I agree with that reading of the DC. The reason I can't join the Majority opinion in full is because the Majority holds that the regulation is unambiguous.[15] As I will explain, even though I agree that the Majority adopts the better reading of § 4.124a, DC 8004, I find the regulation ambiguous. And because the Secretary has not identified any official, authoritative agency position to which the Court can properly defer in terms of resolving the ambiguity before us, I would search for the best reading of the ambiguous regulation. That endeavor necessarily considers the pro-veteran canon of construction, the

---

[13] I join in full the portion of the Majority opinion that vacates and remands the Board's decision denying a disability rating greater than 30% for PTSD. The Board also denied a rating greater than 30% for residuals to the nerves of the hand of a gunshot wound in the right arm, a rating greater than 30% for residuals of a gunshot wound to the right chest (muscle group VI), and a rating greater than 30% for residuals of a gunshot wound to the right triceps (muscle group VI). Because appellant does not challenge those matters on appeal, I also join the Court's dismissal of the appeal as to them. *See Pederson v. McDonald*, 27 Vet.App. 276, 283 (2015) (en banc).

[14] *Ante* at 7.

[15] *Id.* at 8.

application of which removes any doubt here about the proper interpretation of 38 C.F.R. § 4.124a, DC 8004.[16] I will briefly explain my reasoning.

Figuring out whether a regulation is genuinely ambiguous can be tricky business. As the Supreme Court recently made clear: "a court cannot wave the ambiguity flag just because it found the regulation impenetrable on first read. Agency regulations can sometimes make the eyes glaze over. But hard interpretative conundrums, even relating to complex rules, can often be solved."[17] Or as we have held, perhaps not as colorfully as Justice Kagan did in *Kisor*, "complexity and ambiguity are distinct concepts."[18] So, courts must employ the traditional tools of regulatory construction to determine the meaning of a regulation. "[O]nly when that legal toolkit is empty and the interpretative question still has no single right answer can a judge conclude that it is 'more [one] of policy than of law.'"[19]

Regulations can be ambiguous for a number of reasons. As *Kisor* recognizes,[20] high on that list is when the regulation is susceptible to more than one reasonable interpretation in terms of the question at hand.[21] In my view, that is precisely the situation we have here. Even after applying the traditional tools of construction, I conclude that § 4.124a, DC 8004, the preamble, and the note applicable to DCs 8000-8025 do not clearly answer the question before us.[22] There are two principal reasons for this conclusion. First, nothing in any of the three relevant provisions in the regulatory structure separately or collectively addresses how to rate ascertainable but

---

[16] Unlike Judge Jaquith, I believe that the pro-veteran canon applies only after finding an ambiguity in the relevant source of law. *See ante* at 16.

[17] *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019).

[18] *Atencio v. O'Rourke*, 30 Vet.App. 74, 82 (2018).

[19] *Kisor*, 139 S. Ct. at 2415 (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 696 (1991)).

[20] *Id.*

[21] *See, e.g.*, *Smith v. Nicholson*, 451 F.3d 1344, 1350 (Fed. Cir. 2006) (holding that 38 C.F.R. § 4.25(b), DC 6260, is ambiguous because its language "still leaves the pertinent inquiry unresolved"); *Pacheco v. Gibson*, 27 Vet.App. 21, 26 (2014) (holding that 38 C.F.R. § 3.157(b) and (b)(1) are ambiguous because they are subject to both parties' proffered interpretations); *Correia v. McDonald*, 28 Vet.App. 158, 166 (2016) (holding that 38 C.F.R. § 4.59 is ambiguous because its language is susceptible to more than one meaning); *Vilfranc v. McDonald*, 28 Vet.App. 357, 363 (2017) (holding that 38 C.F.R. § 4.150, DC 9905, is ambiguous because the regulation does not answer whether separate ratings should be assigned for dysfunction in both temporomandibular joints); *Urban v. Shulkin*, 29 Vet.App. 82, 88-89 (2017) (holding that 38 C.F.R. § 4.96(a) is ambiguous because both parties presented interpretations consistent with the language of the regulation and the language of the regulation does not explicitly answer the question); *Ray v. Wilkie*, 31 Vet.App. 58, 69 (2019) (holding that 38 C.F.R. § 4.16(b) is ambiguous because it provided incomplete definitions).

[22] *Ante* at 7.

noncompensable Parkinson's manifestations when VA has already assigned a separate compensable rating or ratings for Parkinson's manifestations that total more than 30% under diagnostic codes other than 8004. One can try to piece together the various parts of the rating schedule to determine whether appellant or the Secretary proffers the better reading. As I'll explain, I agree with the Majority's rationale explaining why appellant's reading is truer to the regulatory language and VA's broader policies. However, concluding that appellant's position is the better one does not mean that the regulatory provisions are unambiguous.

A counterexample may be useful. Take *Foster v. McDonough* by contrast.[23] In *Foster*, we held that the plain text of 38 C.F.R. § 4.115b, DC 7528, is unambiguous because the regulation provided step-by-step instructions for how to evaluate prostate cancer, including when a 100% disability rating is warranted, when VA will reexamine the condition, when the 100% rating continues or discontinues, and how to rate prostate cancer residuals after the 100% rating ends.[24] There is nothing comparable here. DC 8004 does not provide step-by-step instructions for when to discontinue, or not discontinue, the minimum 30% rating for Parkinson's manifestations.[25] In sum, § 4.124a, DC 8004, the preamble, and the note applicable to DCs 8000-8025 do not "offer a clear answer to the question presented by this appeal."[26]

Second and relatedly, I find the language of § 4.124a, DC 8004, susceptible to multiple reasonable interpretations. Appellant argues that if there is some uncompensated residual of Parkinson's disease, a claimant is entitled to a minimum 30% to account for that symptom regardless of whether other Parkinson's residuals entitle a claimant to a separate disability rating or ratings greater than 30%.[27] Should additional symptoms manifest to a degree that warrants separate compensable ratings under a different diagnostic code, appellant asserts that the minimum 30% rating remains along with the separate ratings.[28] In contrast, the Secretary treats the 30% rating as a true minimum, meaning a claimant would never be entitled to a lower rating. However, once a residual or residuals would be ratable at greater than 30%, the Secretary asserts that the

---

[23] *Foster v. McDonough*, 34 Vet.App. 338, 345 (2021).

[24] *Id.*

[25] *See* 38 C.F.R. § 4.124a, DC 8004.

[26] *Ante* at 7.

[27] Appellant's Br. at 5-7.

[28] *Id.*; Oral Argument (OA) at 15:45-17:40, *Duran v. McDonough*, U.S. Vet.App. No. 20-5759 (oral argument held November 15, 2022), https://www.youtube.com/watch?v=H3Xng5euocg&t=3387s.

30% minimum rating is no longer necessary because a claimant's ratable residuals ensure that he or she will receive at least the 30% disability rating that VA has determined is the floor for service-connected Parkinson's disease.[29] The regulatory language fails to exclude either party's reading such that, in the words of the Supreme Court, there is "no single right answer" to the question before us.[30] I would therefore hold that § 4.124a, DC 8004 is genuinely ambiguous.

Having found genuine ambiguity in the regulation, what's the next step in the analysis? In many cases, finding a regulation genuinely ambiguous would lead to potential deference to an administrative agency's interpretation of that regulation under *Auer* as refined in *Kisor*.[31] However, that is not the case here. The Supreme Court made clear that *Auer* deference is not a one-size-fits-all doctrine, "for not every reasonable agency reading of a genuinely ambiguous rule should receive *Auer* deference."[32] Under *Auer*, courts only defer to an agency's "authoritative" or "official position" about the meaning of an ambiguous regulation and that position "must at the least emanate from those actors, using those vehicles, understood to make authoritative policy in the relevant context."[33] So, we look to what the Secretary identifies as the source of his interpretation of the regulation. At oral argument, the Secretary made crystal clear that he was seeking *Kisor/Auer* deference with respect to only one source: the Board decision itself.[34]

The Secretary is clearly wrong. A Board decision is not the type of agency action to which a court would ever defer under the Supreme Court's reasoning in *Kisor*. That is certain beyond doubt. The Board expressly said that it was not making a policy judgment of the kind to which deference is owed. The Board stated here (as all Board decisions state) that: "The Board's decision in this case is binding only with respect to the instance matter decided. This decision is not precedential *and does not establish VA policies or interpretations of general applicability*."[35] It is difficult to understand how the Secretary could argue that we should defer to the Board as stating

[29] Secretary's Br. at 9-10.

[30] *Kisor*, 139 S. Ct. at 2415.

[31] *Kisor*, 139 S. Ct. at 2410-15; *Auer v. Robbins*, 519 U. S. 452 (1997).

[32] *Kisor*, 139 S. Ct. at 2416.

[33] *Id*.

[34] OA at 48:15-48:22, 49:18-49-29; 53:55-54:36; 55:05-55:23. Because the Secretary affirmatively disavowed seeking *Kisor/Auer* deference with respect to the ADJUDICATION PROCEDURES MANUAL (or M21-1), I would leave for another day how a court should consider when, if ever, the M21-1 is entitled to deference.

[35] R. at 22 (emphasis added). The Board's statement also refers to 38 C.F.R. § 20.1303 that provides that "Board decisions will be considered binding only with regard to the specific case decided."

the authoritative position of VA on the question before us when the Board itself disclaims any intention to make such policy judgments. I would clearly and unequivocally hold that Board decisions are not entitled to *Kisor/Auer* deference because they do not purport to set out VA's "official position" on, among other things, the "authoritative" meaning of ambiguous regulations.[36]

Because there is no agency position to which the Court might defer, we are left with two plausible interpretations of DC 8004. So, we must determine what is the better reading of the ambiguous regulation. I concur with my colleagues that appellant's interpretation is the better one, even if it is not the only one. I will not repeat the Majority's regulatory analysis here. While I disagree that the regulation unambiguously supports appellant's position, I agree that the contours of the regulation that the Majority highlight point in appellant's direction.[37]

In addition, the pro-veteran canon of interpretation under *Brown v. Gardner* supports appellant's reading.[38] That canon is particularly helpful here because both parties' interpretations of the regulatory structure are plausible.[39] I readily acknowledge that the pro-veteran canon arose in the context of statutory interpretation.[40] But the Court has made clear that the canon applies in the context of regulatory ambiguity as well.[41]

Utilizing the pro-veteran canon to decide between two plausible interpretations does not mean the individual veteran automatically wins. Rather, in my view, the canon means that the Court should adopt an interpretation of an ambiguous statute or regulation that is categorically favorable to veterans as a group. There will be situations in which there is no universal pro-veteran

[36] *Kisor*, 139 S. Ct. at 2416.

[37] *See, e.g.*, *ante* at 5-8.

[38] *See Brown v. Gardner*, 513 U.S. 115, 117-18 (1994); *see also King v. St. Vincent's Hospital*, 502 U.S. 215, 220-21 n.9 (1991).

[39] Because there is nothing to which the Court could legitimately defer under *Kisor/Auer*, this case does not raise the difficult question of how the pro-veteran canon of construction interacts with administrative deference under *Kisor/Auer*. So, I would leave that question for another day. *Compare Kisor v. McDonough*, 995 F.3d 1347, 1354-55 (Fed. Cir. 2021) (Prost, J., concurring) (concluding that interpretive doubt is a precondition to applying the pro-veteran canon), *with Kisor*, 995 F.3d at 1366 (O'Malley, J., dissenting) (concluding that the pro-veteran canon should be used alongside traditional tools of statutory construction).

[40] *See Brown,* 513 U.S. at 117-18.

[41] *See Cottle v. Principi*, 14 Vet.App. 329, 335-36 (2001) ("'[A] VA position that adopts a construction less beneficial to a veteran, as well as any VA resolution of statutory or regulatory ambiguity, would have to take into account the impact of *Gardner,* that held that interpretive doubt is to be construed in the veteran's favor.'") (quoting *Wright v. Gober*, 10 Vet.App. 343, 351 (1997)(alteration in original) and citing *Brown*, 513 U.S. at 117-18; *see also Savage v. Gober*, 10 Vet.App. 488, 495 (1997) ("[T]o the extent that the language of the regulation is ambiguous, 'interpretive doubt is to be construed in the veteran's favor.") (internal quotations omitted).

meaning and, in such cases, the canon has no application. Here, there is no question that reading § 4.124a, DC 8004, as appellant suggests benefits all veterans seeking compensation for Parkinson's disease who manifest ascertainable but noncompensable Parkinson's residuals when VA has already assigned a separate compensable rating or ratings for Parkinson's manifestations that total more than 30% under diagnostic codes other than 8004.

Looking at the competing interpretations in light of the pro-veteran canon, appellant's reading meshes with the operative regulation and VA's broader policies better than the Secretary's contrary view. For example, the Secretary contends that appellant's reading violates the anti-pyramiding rules and risks compensating distinct and separate symptomology more than once.[42] The Majority reasons that the opposite is true because appellant's interpretation "harmonizes with the key policies of VA's overall rating scheme, namely, that veterans should not be undercompensated or overcompensated for a particular condition."[43] The Majority then concludes that the Secretary's interpretation of the regulation results in potential undercompensation.[44] I tend to agree with the Majority's reasoning, reasoning that is strengthened by viewing the question through the lens of the pro-veteran canon of construction. Consider appellant's compensated and uncompensated Parkinson's symptoms for example. The Board found that some of appellant's Parkinson's manifestations—a right upper extremity condition, a right lower extremity condition, and jaw tremors—warranted separate compensable ratings totaling 50%.[45] Not included in those separate ratings are additional ascertainable manifestations—constipation, a chewing and swallowing condition, and a speech condition.[46] Upon the Board's discontinuance of the minimum 30% rating and assignment of separate ratings totaling 50%, appellant no longer received compensation for constipation, a chewing and swallowing condition, and jaw tremors.[47] Without

---

[42] Secretary's Br. at 10.

[43] *Ante* at 7. I note that the Majority's resort to the policy behind the rating schedule is a powerful indication that the regulation at issue is ambiguous. Again, the policy the Majority discusses supports interpreting the regulation in appellant's favor. But it does not support finding the regulation unambiguous.

[44] *Id.* at 8.

[45] R. at 21-22.

[46] R. at 19-21.

[47] R. at 17-18.

leaving the minimum rating intact, appellant appears to be undercompensated for the remaining ascertainable residuals that VA chose not to rate separately.[48]

The Secretary's interpretation may expose claimants to the risk of undercompensation, but that doesn't mean the Secretary's interpretation is not a plausible reading of the regulation. As I've said, although I generally agree with the Majority's logic, I disagree that there is only one way to read the regulation. The Majority's reasoning explains why appellant has a better reading of the regulation and the pro-veteran canon tips the scales to resolve the interpretive doubt in appellant's favor. Appellant's reading allows a claimant to receive the minimum rating *and* separate individual ratings for ascertainable residuals of Parkinson's disease without fearing pyramiding or double compensation. There is simply no risk of overlapping a separate compensable rating or ratings for Parkinson's manifestations with the remaining ascertainable residuals that exist at a non-compensable rate subject to the minimum rating. The manifestations either warrant separate compensable ratings or fall to the catch-all minimum rating—they cannot be in both places at once. Additionally, appellant's interpretation can be applied fairly and equally to any veteran who, as here, manifests ascertainable but noncompensable Parkinson's residuals when VA has already assigned a separate compensable rating or ratings for Parkinson's manifestations that total more than 30% under diagnostic codes other than 8004. On the other hand, the Secretary's interpretation introduces an ostensible danger of undercompensating claimants by discontinuing the minimum rating when uncompensated residuals remain. This is particularly problematic given the progressive nature of the symptoms of Parkinson's disease. Thus, I would hold that the pro-veteran canon resolves any interpretive doubt in appellant's favor.

In sum, I would hold that 38 C.F.R. § 4.124a, DC 8004, is ambiguous, that Board decisions are not entitled to *Kisor/Auer* deference, that appellant has the better reading of the regulation, and that, to remove any question, the Court should apply the pro-veteran canon to resolve interpretive doubt in appellant's favor. For these reasons, I respectfully concur in the judgment only with respect to the question concerning appellant's disability rating for Parkinson's disease.

---

[48] R. at 5, 17-18.